## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**DR. KAMYAR KALANTAR,**

        **Plaintiff,**

v.

**LUFTHANSA GERMAN AIRLINES, et al.,**

        **Defendants.**

</td>
<td>

**Civil Action 01-00644  (HHK)**

</td></tr>
</table>

## MEMORANDUM OPINION AND ORDER

Plaintiff, Dr. Kamyar Kalantar-Zadeh ("Kalantar"),[1] brings this action against Lufthansa German Airlines ("Lufthansa") and two of its employees, Ziba Vali-Coleman and Juergen Starks, under the Federal Aviation Act, 49 U.S.C. §§ 1374 and 1511; the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"); Title II of the Civil Rights Act of 1964 ("Title II"), 42 U.S.C. § 2000a; Article 1 of the Warsaw Convention, *reprinted in note following* 49 U.S.C. § 40105; and for a variety of common law torts.  Kalantar alleges that on March 25, 2000, defendants improperly prevented him from boarding a Lufthansa flight to Frankfurt, Germany, after a dispute over whether he should be required to undergo a more thorough luggage search.  In the ensuing discord, Kalantar claims Vali-Coleman and Starks made defamatory statements against him,

---

[1]      The court follows Kalantar's lead in referring to him by only his first surname, *see* Kalantar Dep. at 7 ("[b]ecause it is a long name and some people prefer to use a simpler name[,] [m]ost of the time I am called Dr. Kalantar without Zadeh.").

      Kalantar's wife, Dr. Grace Lee, originally appeared in this action as a co-plaintiff, on the basis of a claim for loss of consortium.  In the absence of any other stated grounds for her standing to sue, Kalantar effectively removes Lee from this action by stipulating to dismissal of this claim, Pl.'s Opp'n at 26 n.6.  Kalantar's name alone appears in the caption of his opposition brief, which also refers to him in the singular as "plaintiff."

arranged for him to be arrested and detained without justification, and pressed unsubstantiated criminal charges against him.  Presently before the court is defendants' renewed motion for summary judgment [#50].  Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that the motion must be granted in part and denied in part.

## I. BACKGROUND

### A.    Factual History

Kalantar is a physician of Iranian birth and nationality, although he has been a permanent resident of the United States since the mid-1990s.[2]  After attending a conference of the Renal Physician Association held in Washington, D.C., Kalantar went to Dulles Airport, located in northern Virginia, to travel on a Lufthansa Airlines flight to Frankfurt, Germany.  Shortly after reaching the Lufthansa ticket counter, Kalantar presented his ticket and luggage to an agent who took his luggage and issued a boarding pass.  Vali-Coleman, another agent, refused to give him the boarding pass until he consented to a hand-search of his luggage, telling him that because "he had an Iranian passport, he might be a security threat to the flight and to German passengers."  Am. Compl. ¶ 7.  Vali-Coleman added that she was acting pursuant to "top-secret United States government regulations" mandated by the Federal Aviation Administration ("FAA"), and told Kalantar within earshot of other passengers that "he must know that the United States government is against all Iranians."  *Id*.  When Kalantar protested this statement and asked to see the regulation in question, Vali-Coleman refused, allegedly explaining that she could not disclose

---

[2]        Kalantar's complaint states variously that he is a United States citizen, Am. Compl. ¶ 2, and that he has been a United States permanent resident since 1993.  *Id*. ¶ 4.  At his deposition, he testified that at the time of the events giving rise to this suit he was an Iranian national and a United States permanent resident, a status he had since 1996 or 1997.  Kalantar Dep. at 12-13.

it because it was "confidential."  Kalantar Dep. at 50-52.  Vali-Coleman instead threatened to call the police unless he complied with her instructions.  Kalantar responded that her insistence on conducting an additional search of his baggage "[was] most likely illegal and racist," and that he would welcome the arrival of the police because "I have also my protest to convey to them."  *Id*. at 57.

After a few minutes, two airport police officers arrived at the Lufthansa ticket counter. The officers engaged in dialogue with Kalantar and Vali-Coleman, attempting unsuccessfully to find an FAA agent to explain the regulation to Kalantar and to have Vali-Coleman show him the regulation.  Kalantar states that while he demanded to see the regulation or be apprised of its contents, he also allowed that "if this is an FAA regulation I do not have any problem with [the] luggage search."  *Id*. at 70.

At this point, Starks, Lufthansa's flight manager on duty at the time, approached the counter and after a brief exchange told Kalantar that he and Vali-Coleman "decided to deny you the flight because you refused [a] luggage search and you called us racist."  *Id*. at 80.  After further confrontation, Starks told Kalantar that he would ask the police officers to "relocate" him, *id*. at 82-83, and one of the police officers then asked Kalantar to leave the counter.  When Kalantar hesitated, mentioning that the airline agents were holding his passports, his ticket, his boarding card, and luggage, Starks asked the officers to remove him.  The officers then handcuffed Kalantar and led him to a wall adjacent to the Lufthansa ticket counter.  As Kalantar was being led away, Starks allegedly smiled at him and said, "your unprofessional conduct will be handled legally soon."  *Id*. at 86.

After the police recovered Kalantar's possessions from the ticket counter and searched him, they transferred him to a detention room at the airport police station.  At the station, Kalantar spoke with a police sergeant, Alan Pellerin, who said he would try to help Kalantar catch his flight on time, or assist him in otherwise arranging for transportation to Germany.  After calling Lufthansa, though, Pellerin told Kalantar that Starks insisted that Kalantar be kept in custody, and indicated that the airline would press charges against him.  Police officers then took Kalantar to an appearance before a magistrate, stopping *en route* at the Lufthansa ticket counter at the airport terminal.  One of the officers returned with a document from Lufthansa, purportedly a report from the airline's employees testifying against Kalantar.  When Kalantar appeared before the magistrate, the magistrate allegedly said that he saw no reason for Kalantar's arrest and detention, until he read Lufthansa's written statement.  At that point, he said "now the story is different.  Now we have a reason for arrest . . . this is criminal trespassing."  *Id*. at 108.  After setting a date for Kalantar's arraignment, the magistrate released him.

Kalantar returned to Dulles the next afternoon, renewing his efforts to obtain passage to Germany.  At the ticket counter, he encountered Vali-Coleman once more.  This time, though, Vali-Coleman did not say anything about conducting a luggage search, even when Kalantar specifically asked about it, and issued him his boarding pass without incident or "any major conversation."  *Id*. at 120.  Kalantar then flew to Germany.  Upon his return to Dulles, on March 28, 2000, he went to the Lufthansa ticket counter to try to obtain a copy of the testimony Lufthansa had prepared against him in preparation for his arraignment.  Vali-Coleman, yet again at the counter, told Kalantar to wait for a few minutes.  She apparently then summoned airport police, telling them that he was "threatening" her.  *Id*. at 127.  An officer arrived, talked with

4

Kalantar, and gave him a telephone number to which he could direct his inquiry.  Kalantar

attended his arraignment and appeared for his trial date several months later.  Kalantar pled not

guilty, and all charges against him were dropped.

Not surprisingly, Vali-Coleman and Starks paint a different picture of the events of

March 25, 2000.  Vali-Coleman admitted telling Kalantar that he would be subject to further

search because he held an Iranian passport, and that the airline would not transport him if he

refused to undergo the luggage search.  She said, however, that she only called the police upon

Kalantar's demand that she do so.  Kalantar, she testified, "started making a derogatory speech,

insulting the airline, the Germans, calling us Nazis and Hitler, and that he was being

discriminated against because he is an Iranian Jew."  Vali-Coleman Dep. at 54.  When the police

arrived, they explained to Kalantar that he would either have to comply with Lufthansa's baggage

search or else leave the ticket counter.  According to Vali-Coleman, Kalantar "wanted to be

arrested."  *Id*. at 61.  She denied that she or anyone else at Lufthansa pressed charges against

Kalantar, although she stated that at the request of police she prepared an incident report with the

help of Starks and another Lufthansa employee.  She testified that she never recalled Kalantar

agreeing to a search if it was required by FAA regulation.  On the next day, when Vali-Coleman

checked Kalantar in without incident, he presented her with a United States passport, which he

had allegedly not shown her the day before.[3]  Starks, for his part, testified that he instructed

---

[3]       In addition to his Iranian passport, Kalantar testified that he holds a "white
passport," a travel document issued to United States permanent residents.  Kalantar Dep. at 11.
Contrary to Vali-Coleman's testimony, Kalantar asserts that he presented her the 'white passport'
to Vali-Coleman on March 25, 2000, but that she determined that "since [he had an] Iranian
passport, no matter how many other passports [he had, his] luggage needs to be searched."  *Id*. at
46.

Kalantar to go to a security checkpoint, and that Kalantar responded, "if [Starks would] take Aryans out of the line and they go with him and the Lufthansa rep, then he would go to the security checkpoint."  Starks Dep. at 61.  The police officers then, in Starks' recollection, told Kalantar that he would have to leave the area or they would escort him out, and Kalantar "put his hands behind his back and said, '[a]rrest me.'"  *Id*. at 63.  Starks admitted to being involved in the drafting of an incident report, but denied either sharing the report with anybody or having any contact with police after Kalantar's arrest.

## B.    Procedural History

Kalantar initiated this action on March 23, 2001.  After answering the complaint, defendants filed an *ex parte* motion for summary judgment under seal.  In this motion, defendants argued that they were entitled to judgment as a matter of law because their conduct toward Kalantar was mandated by an FAA directive which they could not disclose without the agency's permission.  Kalantar responded with a motion to strike, proposing in the alternative that his attorney be permitted to review the motion subject to a court order that he not disclose any information regarding the security directive to anyone, including his client.  After a hearing on this motion, the court issued an order on February 21, 2002, directing defense counsel to disclose the summary judgment motion to Kalantar's counsel and to deliver a copy of the court's order to the FAA.[4]  The United States Transportation Security Administration then moved to stay the court's order, and the United States filed a statement of interest on April 10, 2002.  In this filing, the United States asked the court to decide whether Kalantar's need to obtain the FAA

---

[4]        For a comprehensive account of the procedural history of this case, see *Kalantar v. Lufthansa German Airlines,* 276 F. Supp. 2d 5, 7-9 (D.D.C. 2003).

directive was moot in light of the possible preemptive effect of Article 17 of the Warsaw

Convention.[5]  On August 7, 2003, the court ruled that Article 17 of the Warsaw Convention did

not preempt Kalantar's claims, and that therefore defendants could refile their motion for

summary judgment as redacted by the Transportation Security Administration.  This motion,

seeking summary judgment on all counts, is now before the court.

## II. ANALYSIS

**A.      Legal Standard**

Under Fed. R. Civ. P. 56, summary judgment shall be granted if the pleadings,

depositions, answers to interrogatories, admissions on file and affidavits show that there is no

genuine issue of material fact in dispute and that the moving party is entitled to judgment as a

matter of law.  Material facts are those "that might affect the outcome of the suit under the

governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering a

motion for summary judgment, the "evidence of the non-movant is to be believed, and all

justifiable inferences are to be drawn in his favor."  *Id.* at 255.  The non-moving party's

opposition must consist of more than mere unsupported allegations or denials and must be

supported by affidavits or other competent evidence setting forth specific facts showing that there

is a genuine issue for trial.  FED. R. CIV. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24

(1986).  The non-moving party is "required to provide evidence that would permit a reasonable

jury to find" in its favor.  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the

---

[5]        Convention for the Unification of Certain Rules Relating to International
Transportation by Air, October 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11, *reprinted
in note following* 49 U.S.C. § 40105.

evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

**B.    Claims Under Federal Law**

**1. Federal Aviation Act and "Common Carrier Duty"**

Kalantar notes in his opposition brief that he "will stipulate to a dismissal of [his] claim under the Federal Aviation Act."  Pl.'s Opp'n at 26 n.6.  In addition, he offers no response to defendants' argument that federal statutes have supplanted, and preempted, any common law duty that airlines may have had to "provide . . . air transportation in a manner that does not discriminate on the basis of race, religion, or national origin."  Defs.' Mot. for Summ. J. at 11 (citing Am. Compl. ¶ 20).  The court, therefore, treats defendants' argument as conceded, and dismisses both of these claims.

**2. Section 1981**

Kalantar next asserts that defendants violated his rights under the Civil Rights Act of 1866, 49 U.S.C. § 1981, which provides in part that "all persons shall have the same right in every State and Territory to make and enforce contracts as is enjoyed by white citizens . . . ." Section 1981 is violated only by "purposeful discrimination."  *Gen. Bldg. Contractors' Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982).  To prevail on a § 1981 claim, a plaintiff must establish that he was treated differently than other similarly situated individuals, on account of his race. *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1413 n.7 (1988). Kalantar asserts in his complaint and his opposition to defendants' summary judgment motion

that he was singled out for the more extensive luggage search on the basis of his race[6] and

religion,[7] and that defendants therefore violated his civil rights.

There is an essential defect in Kalantar's position that compels summary judgment for

defendants on this claim:  he does not provide any evidence that shows, or even implies, that race

was the reason he was subjected to a more extensive search.  On the contrary, Kalantar's own

deposition testimony indicates instead that Vali-Coleman and Starks both told him that his

presentation of an Iranian passport triggered the additional security measures.  For example,

Kalantar testified that Vali-Coleman told him that "since you have an Iranian passport you

require [a] luggage search, and more search [sic] if necessary."  Kalantar Dep. at 26; *see also id*.

at 46, 47 ("all Iranians with [an] Iranian passport require[] special treatment.").  Kalantar stated

that when Lufthansa employees asked him to undergo the more extensive luggage search during a

previous flight with the airline in December 1999, a police officer spoke with the airline agents

and "made them show me the [FAA] regulation," which Kalantar read.  *Id*. at 177.  The

---

[6]     Several courts have recognized that because Iranians have "membership in a group that is ethnically and physiognomically distinctive," they fall under § 1981's protections. *Alizadeh v. Safeway Stores, Inc.*, 802 F.2d 111, 114 (5th Cir. 1986); *see also Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1387 (10th Cir. 1991).

[7]     Although he seems to have abandoned this argument in his opposition brief, Kalantar initially alleged that Lufthansa's employees also discriminated against him on the basis of his religion.  Lufthansa, Kalantar stated in his deposition testimony, required the additional baggage screening "only to intimidate me since I said I am an Iranian Jew," Kalantar Dep. at 192. During the same deposition, though, Kalantar stated that while he claimed "Jewish background," *id*. at 34, he "do[es] not have any religion," and "did not have any religion" on March 25, 2000, *id*. at 13.  There is also no indication in the record that defendants were even aware of Kalantar's religion until he specifically brought it up, recounting that he told Vali-Coleman that "it could be perceived she is doing this to me because I am Iranian and I have Jewish background."  *Id*. at 54. Nor does Kalantar point to any evidence to suggest that Vali-Coleman (and later, Starks) treated Kalantar disparately once they became aware of his claimed heritage.

regulation, according to Kalantar, "said that the holders of passports from the foreign countries should be – should or may require luggage search.  And then there was the name of four or five countries," including Iran.[8]  *Id*. at 178.  Kalantar also reported that the Lufthansa agents he interacted with before embarking on the December 1999 flight also told him that "nobody is supposed to tell me since I have an Iranian passport I need [a] luggage search."  *Id*. at 194.

This evidentiary shortcoming is consequential because "Section 1981 does not prohibit national origin discrimination *per se*," but only when such discrimination is "'based on racial or ethnic characteristics associated with the national origin in question.'" *Amiri v. Hilton Wash. Hotel*, 360 F. Supp. 2d 38, 42 (D.D.C. 2003) (citing *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) and quoting *Wesley v. Howard Univ.*, 3 F. Supp. 2d 1, 4 (D.D.C. 1998)); *see also Kidane v. Northwest Airlines, Inc.*, 41 F. Supp. 2d 12, 17 (D.D.C. 1999) (no cognizable § 1981 claim for plaintiff who alleged discrimination solely on the ground that he was from Ethiopia); *Zar v. S.D. Bd. of Exam'rs of Psychologists*, 976 F.2d 459, 467 (8th Cir. 1992) (district court properly granted summary judgment to defendant where plaintiff based his § 1981 claim solely on the fact that he was of Iranian national origin); *cf. Saint Francis Coll.*, 481 U.S. at 613 (noting that plaintiff could prevail on § 1981 claim upon showing that "he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the

---

[8]        Kalantar later equivocated on this point:
"Q: Didn't the FAA regulation say that passengers presenting with Iranian passports can, should be searched?
    A: It was not as strict as the Lufthansa officer had told me.  There were such regulations and I talked with the FAA person over the phone, that I saw something and they say these are safety regulations that are confidential and I was not supposed to be told about them."  *Id*. at 189.

place or nation of his origin").  Kalantar has not brought forward any evidence that he was singled out for the extra search on the basis of such "racial or ethnic characteristics" as opposed to his citizenship, so his § 1981 claim must fail.

### 3. Title II

Title II of the Civil Rights Act of 1964 provides that "[a]ll persons shall be entitled to full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations *of any place of public accommodation*, *as defined in this section*, without discrimination or segregation on the ground of race, color, religion, or national origin."  42 U.S.C. § 2000a(a) (emphasis added).[9]  Title II goes on to define a "place of public accommodation" as follows:

> Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter . . .
>
> (1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;
>
> (2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including but not limited to, any such facility located on the premises of any retail establishment; or any gas station;
>
> (3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

---

[9]      A plaintiff seeking redress under this statute may only obtain injunctive relief, not damages. *Brooks v. Collis Foods, Inc.*, 365 F. Supp. 2d 1342, 1351 (N.D. Ga. 2005) (citing *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 401-02 (1968) (other citation omitted)).

(4) any establishment (A)(i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

*Id*. § 2000a(b).

Kalantar asserts that the protections of Title II apply to "transportation facilities and places, such as airport terminals, airline ticket counters, and airliners," Pl.'s Opp'n at 16, and that Lufthansa ran afoul of the statute by "denying [him] the full and equal enjoyment" of goods and services. Am. Compl. ¶ 26. The crux of Kalantar's Title II claim is that he was improperly denied air travel to Frankfurt on the same terms as the other ticketed passengers, not that he was improperly denied admission to the airport itself or to the Lufthansa ticket counter line. The relevant question, then, is whether Title II's coverage extends to airplanes.

Although Title II "is to be liberally construed and broadly read," *Miller v. Amusement Enters.*, 394 F.2d 342, 349 (5th Cir. 1968), the statute "clearly delineates the entities which are to be considered covered as places of public accommodation." *Huggar v. Northwest Airlines, Inc.*, 1999 WL 59841 at *3 (N.D. Ill. Jan. 27, 1999). Among the four categories of places of public accommodation provided by Title II – places of lodging, places of eating, places of entertainment, and establishments located within or surrounding these other three types of premises – none even remotely resembles an airline, or indeed any other vehicle or mode of transportation. *See id*. (finding that "Title II . . . does not govern aircraft."); *see also Baker v. Greyhound Bus Line*, 240 F. Supp. 2d 454, 455 (D. Md. 2003) (finding that "buses . . . do not appear to be a 'place of public accommodation' within the meaning of Title II."). Accordingly, the court dismisses Kalantar's Title II claim.

### 4. Warsaw Convention, Article 1

Kalantar next asserts a claim under Article 1 of the Warsaw Convention,[10] Am. Compl.

¶ 28, authority that he contends "expressly provides for damages occasioned by delays in

international travel," Pl.'s Opp'n at 18.  Defendants reply that "Article 1 provides no cause of

action."  Defs.' Mot. for Summ. J. at 14.  While Article 1 simply states that "[t]his convention

shall apply to all international transportation of persons, baggage, or goods performed by aircraft

for hire," Article 19 of the Convention provides that subject to certain limitations, "[t]he carrier

shall be liable for damage occasioned by delay in the transportation by air of passengers,

baggage, or goods."  *Note following* 49 U.S.C. § 40105.  Article 19 has been widely recognized

to supply air travelers with a cause of action for damages incurred from delays in international air

travel, *see, e.g.*, *Sassouni v. Olympic Airways*, 769 F. Supp. 537, 539-40 (S.D.N.Y. 1991), and in

fact provides "the exclusive remedy" for damages in such instances, *Harpalani v. Air India, Inc.*,

622 F. Supp. 69, 73 (N.D. Ill. 1985), *disapproved of on other grounds by Wolgel v. Mexicana*

*Airlines*, 821 F.2d 442, 445 (7th Cir. 1987); *Rogers v. Am. Airlines, Inc.*, 192 F. Supp. 2d 661,

665 (N.D. Tex. 2001).  The Warsaw Convention thus clearly provides Kalantar a route to

recovery for his delay, and despite their asserted ignorance defendants are deemed to be on notice

of this claim.

---

[10]      In November 2003, a new air carriage treaty, the Montreal Convention, entered into force in the United States, superseding the Warsaw Convention.  *Paradis v. Ghana Airways Ltd.,* 192 F. Supp. 2d 106, 110, nn. 4-5 (S.D.N.Y. 2004).  For purposes of the present action, this new regime does not work any material change, and the court refers to the Warsaw Convention (the treaty named in the complaint and in the parties' briefing) for the sake of clarity.

The real problem for Kalantar is that he has not come forward with any evidence to support such a claim.  It is undisputed that Kalantar missed his originally scheduled flight on March 25, 2000, but it is equally clear from his testimony that he flew to Germany on the next day.  Kalantar Dep. at 121-22.  Kalantar alleges a number of injuries he suffered – for example, various medical ailments, *id*. at 142; damages to "reputation, character, and dignity," *id*. at 151; a delayed Ph.D. exam due to posttraumatic stress, *id*. at 149; as well as both a week's wages, *id*. at 162; and several million dollars in potential grant money lost for the same reason, *id*. at 153.  By his account, though, all of these injuries stem from his arrest and detention, not from the approximately 24-hour delay in his travel itinerary.

District courts have expressed uncertainty over whether plaintiffs asserting a claim under Article 19 may seek recovery for inconvenience, *see Harpalani*, 622 F. Supp. at 71, or emotional distress, *see Sassouni*, 769 F. Supp. at 540; or instead need to plead and ultimately prove economic or physical injury, *see Daniel v. Virgin Atl. Airways Ltd.*, 59 F. Supp. 2d 986, 992-93 (N.D. Cal. 1998).  Kalantar, though, does not connect any of these injuries to his inability to board his originally scheduled flight on March 25, 2000, and therefore his claim under the Warsaw Convention must be dismissed.

## C.    Claims Under State Law

The court adjudicates Kalantar's state law claims by virtue of diversity jurisdiction. When a federal district court exercises jurisdiction over state law claims on such a basis, "the outcome of the litigation . . . should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." *Felder v. Casey*, 487 U.S. 131, 151 (1988) (quoting *Guaranty Trust Co. v. York*, 326 U.S. 99, 109 (1945)).

14

A federal court exercising diversity jurisdiction applies the choice of law rules of the forum state, *Liberty Mut. Ins. Co. v. Travelers Indem. Co.*, 78 F.3d 639, 642 (D.C. Cir. 1996) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)), here the District of Columbia.  The District of Columbia determines which jurisdiction's law should apply to tort cases by following the "substantial interest" position of the Restatement (Second) of Conflict of Laws (1971) § 145, under which the court "will balance the competing interests of the two jurisdictions, and apply the law of the jurisdiction with the more 'substantial interest' in the resolution of the issue." *Jaffe v. Pallotta TeamsWorks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004) (quoting *Lamphier v. Wash. Hosp. Ctr.*, 524 A.2d 729, 731 (D.C. 1987) (internal quotation marks omitted)).  This inquiry requires consideration of (1) "the place where the injury occurred," (2) "the place where the conduct causing the injury occurred," (3) "the domicile, residence, nationality, place of incorporation and place of business of the parties," and (4) "the place where the relationship" was centered.  *Herbert v. District of Columbia*, 808 A.2d 776, 779 (D.C. 2002) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1971), § 145(2)).  Because the Commonwealth of Virginia is the jurisdiction where the alleged injury and the conduct causing the injury both occurred, as well as the only place where the parties' relationship was "centered," the court will resolve Kalantar's state law claims under Virginia law.

### 1. Preemption

As an initial matter, defendants argue that all of Kalantar's state law claims "are preempted by the express preemption provision of the Airline Deregulation Act," 49 U.S.C. § 41713(b).  This argument is wholly without merit.

15

The section defendants cite provides that "a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart."  49 U.S.C. § 41713(b).  The statute does not, however, preempt alleged misconduct by employees of an air carrier *unrelated* to price, route, or service.  With the exception of his claims for defamation and violation of Virginia human rights laws, Kalantar's state law claims do not pertain to Lufthansa's "determination not to grant permission to board," *Smith v. Comair, Inc.*, 134 F.3d 254, 259 (4th Cir. 1998), but rather to independent acts which Vali-Coleman and Starks took *after* informing Kalantar he would not be permitted to board his scheduled flight on March 25, 2000.  As another district court noted, "arrests and imprisonments based on false factual assertions," as Kalantar alleges, are "conduct which affects airline services in too tenuous, remote, or peripheral a manner to have any preemptive effect."  *Chrissafis v. Continental Airlines*, 940 F. Supp. 1292, 1299 (N.D. Ill. 1996) (quoting *Morales v. Trans World Airlines, Inc.*, 540 U.S. 374, 390 (1992) (internal quotation omitted)).  Defendants' companion argument, that "[a]viation security is a national concern," Defs.' Reply at 8, and that, presumably, the airline is thus automatically immune from suit, is similarly futile.

### 2. False Imprisonment/False Arrest

Under Virginia law, false imprisonment is "restraint of one's liberty without any sufficient legal excuse therefor by words or acts which he fears to disregard, and neither malice, ill-will nor the slightest wrongful intention is necessary to constitute the offense."  *S.H. Kress & Co. v. Musgrove,* 149 S.E. 453, 455 (Va. 1929).  To maintain a false imprisonment claim, a

16

plaintiff need not "be confined in jail or placed in the custody of an officer." *Zayre of Va., Inc. v. Gowdy*, 147 S.E. 2d 710, 713 (Va. 1966) (citing *Musgrove*, 149 S.E. at 453-55; *Montgomery Ward & Co. v. Wickline*, 50 S.E. 2d 387, 388, 389 (Va. 1948) (other citation omitted)).  This tort "is also referred to as false arrest."  *Coughlan v. Jim McKay Chevrolet, Inc.*, 18 Va. Cir. 265, 1989 WL 646497 at *1 (Va. Cir. Ct. Nov. 13, 1989).

Here, Kalanatar alleges that Vali-Coleman threatened to call the police if he did not consent to a luggage search, Kalantar Dep. at 54; that when the police officers arrived, Starks asked them to "relocate" Kalantar, *id*. at 82; that the police then handcuffed and arrested Kalantar, *id*. at 85, during which time Starks was "smiling" at him, *id*. at 86-87; and that once detained, Kalantar spoke with a police sergeant who wanted to release him but did not because Starks "insisted that I have to be maintained arrested [sic]," *id*. at 98.  One of the police officers who actually arrested Kalantar allegedly told him that "he arrested [Kalantar] for disturbance at Lufthansa airport [sic] at the request of Lufthansa officers or employees," who "wanted [Kalantar] to be arrested because [he] disturbed them."  *Id*. at 107.  Kalantar further testified during his deposition that after his detention, when he appeared before a magistrate, the magistrate was ready to release him until he read the report prepared by Starks and Vali-Coleman, and that he "did not have any choice but to charge me with criminal trespassing," *id*. at 108-09.  While Lufthansa's employees clearly tell a different story about the encounter of March 25, 2000, Kalantar has introduced sufficient evidence on this claim to preclude summary judgment for defendants.

Defendants urge upon the court an unpublished Fourth Circuit decision which held that if "private parties did not make any arrest," they "therefore cannot be held liable for a false arrest." *Commercial Energies, Inc. v. United Airlines, Inc.*, 1994 WL 251849 at *4 (4th Cir. 1994). This conclusion runs counter to the mainstream of Virginia, and indeed Fourth Circuit, caselaw. Rather, when "the arrest of the plaintiff was at the instance and direction of the defendant's employees, who acted within the scope of their authority, the plaintiff's evidence ma[kes] out a case against the defendant company." *Wickline*, 50 S.E. 2d at 389 (citing *Long v. Eagle 5,10, & 25¢ Store Co.*, 198 S.E. 573 (N.C. 1938)). Courts in Virginia (and neighboring states) have repeatedly permitted a plaintiff to maintain a false imprisonment claim against private-party defendants who did not themselves physically apprehend the plaintiff but rather requested that others do so. *See, e.g., Dotson v. U-Haul Co.*, 42 Va. Cir. 121, 1997 WL 1070564 at *1 (Va. Cir. Ct. Apr. 9, 1997) (plaintiff met requirements for false imprisonment claim when police detained him "based upon the Defendant's report."); *see also Montgomery Ward & Co. v. Medline*, 104 F.2d 485, 486 (4th Cir. 1939) (affirming North Carolina district court's ruling that plaintiff presented triable jury issue on false imprisonment claim when she was detained at police station "at the express direction" of employee of defendant store). Consequently, Kalantar may proceed to trial on this claim.

### 3. Assault and Battery

Battery is "an unwanted touching which is neither consented to, excused, nor justified." *Koffman v. Garnett*, 574 S.E. 2d 258, 261 (Va. 2003) (citing *Washburn v. Klara*, 561 S.E. 2d 682 (2002); *Woodbury v. Courtney*, 391 S.E. 2d 293 (1990)). Under Virginia law, the 'unwanted touching' need not cause physical injury or be particularly forceful; rather, "the slightest touching

18

of another, or of his clothes, or cane, or anything else attached to his person, if done in a rude, insolent or angry manner constitutes a battery." *Park v. Shiflett,* 250 F.3d 843, 852 (4th Cir. 2001) (citing *Crosswhite v. Barnes*, 124 S.E. 242, 243 (Va. App. 1924)).  In other words, whether liability attaches depends on "the intent of the actor, not on the force applied."  *Adams v. Commonwealth*, 534 S.E. 2d 347, 350 (Va. App. 2000).

Assault, meanwhile, consists of "an act intended to cause harmful or offensive contact with another person or apprehension of such contact . . . that creates in that other person's mind a reasonable apprehension of an imminent battery."  *Koffman*, 574 S.E. 2d at 261 (citing RESTATEMENT (SECOND) OF TORTS § 21 (1965); CHARLES E. FRIEND, PERSONAL INJURY LAW IN VIRGINIA § 6.3.1 (2d ed. 1998) at 226; FOWLER V. HARPER, ET AL., THE LAW OF TORTS § 3.5 (3d ed. Cumulative Supp. 2003) at 3:18-19).  "The essence of an assault is an overt threatening physical gesture."  FRIEND § 6.3.1 at 226.  Although they may often occur in conjunction with one another or arise from the same set of facts, assault and battery in Virginia are "two independent torts," *Koffman*, 574 S.E. 2d at 261 (citing FRIEND, § 6.2.1), and a defendant may be found liable for one but not the other.  W. PAGE KEETON, PROSSER AND KEETON ON TORTS § 10 (5th ed. 1986) at 46.

Kalantar presents an unusual variation on the typical assault and battery scenario.  With respect to battery, he makes no allegation that either of the individual defendants actually touched him without his consent.  Rather, he claims that Starks and Vali-Coleman directed police officers to detain and handcuff him, and that accordingly "Lufthansa can be held liable for an unlawful touching that its employees caused but did not commit themselves."  Pl.'s Opp'n at 21.  Kalantar relies exclusively on *Adams v. Commonwealth* for the proposition that "it is sufficient that the

cause is set in motion by the defendant, or that the [victim] is subjected to its operation by means of any act or control which the defendant exerts." *Id*. at 350 (alteration in original) (quoting *Banovitch v. Commonwealth*, 83 S.E. 2d 369, 374 (1954)).  *Adams*, however, is readily distinguishable from the circumstances at hand.  In *Adams*, the Virginia Court of Appeals decided that a criminal defendant[11] was properly found guilty of battery when he shined a laser into a police officer's eyes.  The court held that "for purposes of determining whether a battery has occurred, contact by an intangible substance such as light must be considered in terms of its effect on the victim." *Id*. at 351.  While "there need be no actual injury for a touching to have occurred . . . the evidence must prove that the substance made objectively offensive or forcible contact with the victim's person resulting in some manifestation of a physical consequence or corporeal hurt." *Id*.

Although *Adams* also indicates that liability may attach when the unwanted touching was "set in motion by the defendant," *id*. at 350, this language arises from a line of criminal battery cases where an offensive instrument was under the exclusive control of the defendant, and caused the plaintiff grave physical injury.  *See Banovitch*, 83 S.E. 2d at 371, 375 (quack doctor who provided 'Cancer Ointment' and other salves to patient, which disfigured her nose, properly tried on charges of assault and battery); *Commonwealth v. Stratton*, 114 Mass. 303, 1873 WL 12016 at

---

[11]      At least insofar as the required elements, there seems to be no salient difference between civil and criminal assaults.  *See Carter v. Commonwealth*, 606 S.E. 2d 839, 841 (Va. 2005) (noting that prior authorities "compel the conclusion that a common law assault, whether a crime or a tort, occurs when an assailant engages in an overt act intended to inflict bodily harm and has the present ability to inflict such harm or engages in an overt act intended to place the victim in fear or apprehension of bodily harm and creates such reasonable fear or apprehension in the victim."); *but see* Friend § 6.2.1 at 215-16 n.1 (with respect to civil versus criminal battery, "the two should not be confused, and rules applicable to one should not be assumed to be applicable to the other.").

*1 (Mass. 1873) (suitor who fed young woman figs laced with poison guilty of assault and

battery).[12]  Here, while Kalantar concedes that neither Starks nor Vali-Coleman touched him,

either with their own bodies or with a physical object or "intangible substance," he apparently

argues that the police officers' laying hands on him constituted the unlawful touching.[13]  To

achieve coherence, though, this claim depends upon the incredible proposition that the police

officers were acting not just at defendants' request, but under their exclusive control.

As for his assault claim, Kalantar's testimony is somewhat convoluted.  He initially stated

that he was afraid Starks would strike or hit him, *id.* at 219, but soon clarified that he was

actually afraid instead about missing his flight and the effect this might have on his son, *id.* at

220.  He then variously stated that he was not afraid Starks or Vali-Coleman would strike him,

*id.* at 220-21, 223, and that he *was* afraid, "maybe to some extent due to loud voices, the voice of

Ms. Vali-Coleman," who he speculated "might throw my luggage or my passport into my face . .

. ," *id.* at 222.  Kalantar's testimony, the only evidence he has adduced to support this claim, is

simply too self-contradictory and tenuous to create a genuine issue of material fact as to a fear

---

[12]     This principle of liability is not indigenous to North America.  *Stratton* noted that in an English case, "one who put Spanish flies into coffee to be drank by another, was convicted of an assault upon the person who took it, although it was done 'only for a lark.'"  *Id.* at *3 (citing *Regina v. Button*, 8 C. & P. 660).  *But see Daingerfield v. Thompson*, 33 Gratt. 136, 1880 WL 6148 at *6, 8-9 (Va. 1880) (defendant and two companions sought admission to a closed restaurant to "get oysters and something to drink"; defendant properly found liable for trespass and assault after he "advised and instigated" one of the other men to fire a pistol as a "salute," which grievously injured the restaurant-keeper).

[13]     In Virginia, though, "a police officer does not commit a battery when he touches someone appropriately to make an arrest," *Gnadt v. Commonwealth*, 497 S.E. 2d 887, 888 (Va. Ct. App. 1998), such as by placing handcuffs on the arrestee.  Kalantar does not allege that the arresting officers mishandled him or used excessive force.

that Vali-Coleman was about to batter him.   Accordingly, the court grants summary judgment to defendants on Kalantar's claim for assault and battery.

### 4. Intentional Infliction of Emotional Distress

Under Virginia law, intentional infliction of emotional distress requires that (1) "the wrongdoer's conduct was intentional or reckless"; (2) "the conduct was outrageous and intolerable in that it offends generally accepted standards of decency and morality"; (3) the conduct "caused the emotional distress"; and (4) "the emotional distress was severe." *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 472 (4th Cir. 1999) (citing *Womack v. Eldridge*, 210 S.E. 2d 145, 148 (Va. 1974)).

With respect to the first element of this cause of action, defendants argue that "there are no facts to support the notion that the Lufthansa employees intentionally tried to inflict emotional distress" on Kalantar.  Defs.' Mot. for Summ. J. at 17.  Defendants misstate one of the essential elements of this tort, for it is not necessary that a defendant intends to cause the plaintiff emotional distress.  *Womack*, which defendants cite in support of their restrictive reading of this cause of action, actually holds that the first element of the tort "is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress *or* where he intended his specific conduct and knew or should have known that emotional distress would likely result."  210 S.E. 2d at 148 (emphasis added).  Although the details of Starks' and Vali-Coleman's communications with the police are contested, defendants do not dispute that Vali-Coleman actually called the officers, and that she submitted an incident report to them.  There can be little doubt that she performed these actions intentionally, that is consciously and deliberately.

Kalantar has gone further, introducing enough evidence that Vali-Coleman and Starks "intentionally and maliciously caused [him] to be arrested, confined, and restrained without probable cause and without any basis for the arrest," Am. Compl. ¶ 33, to foreclose summary judgment for Lufthansa on this basis.

Defendants next attack Kalanatar's showing on the second element of his intentional infliction of emotional distress claim, whether the complained-of conduct was insufficiently outrageous. Defendants contend that Vali-Coleman and Starks "were merely questioning [Kalantar] as they were required to do under federal aviation law." Defs.' Mot. for Summ. J. at 17. Once again, defendants mistake (or obscure) the conduct giving rise to Kalantar's complaint. His intentional infliction of emotional distress claim is based on his arrest, detention, and aborted trial, not on his inability to board a Frankfurt-bound jet. *See* Am. Compl. ¶¶ 33-35; Kalantar Dep. at 141 ("I am seeing the visions of me being in that prison . . . the handcuffs, the magistrate's waiting room, Mr. Starks smiling when the handcuffs were placed on me."); *id.* at 143 (referring to "[n]ightmares seeing Mr. Starks smiling, nightmares about me being in the court and being convicted"). It seems beyond reason to suggest that "federal aviation law" compels, or authorizes, airline agents to arrange for passengers who displease them to be arrested, detained, and charged with criminal conduct.

Whether Vali-Coleman and Starks' actions in allegedly arranging Kalantar's arrest and urging charges to be pressed against him are sufficiently "outrageous and intolerable," rather than a "situation[] where only bad manners and mere hurt feelings are involved," is initially a matter for the court's consideration. *Womack*, 210 S.E. 2d at 148; *Gaiters v. Lynn*, 831 F.2d 51, 53 (4th Cir. 1987) (citation omitted). "'Where reasonable men may differ," however, "it is for the jury . .

23

. to determine whether . . . the conduct has been sufficiently extreme and outrageous to result in liability.'" *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 46 at 77). The court will not determine, as a matter of law, that the conduct Kalantar alleges falls short of the requisite severity. Although no court appears to have addressed this issue under Virginia law, courts in other jurisdictions have found that "causing the innocent plaintiff to be subject to [] an accusation of crime and putting her in fear" that charges will be brought "passes the bounds of conduct that will be tolerated by a civilized society and is, therefore, outrageous conduct." *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 307 (5th Cir. 1989) (intentional infliction of emotional distress claim properly before jury); *see also Fleming v. U-Haul Co. of Georgia*, 541 S.E. 2d 75, 80 (Ga. Ct. App. 2000) (reasonable jury could find that defendants' role in arranging arrest of truck lessor was sufficiently "atrocious" and "intolerable" to support verdict for plaintiff on intentional infliction of emotional distress claim); *Blong v. Snyder*, 361 N.W. 2d 312 (Iowa Ct. App. 1984) (trial court erred in issuing judgment notwithstanding the verdict on intentional infliction of emotional distress claim of plaintiff accused by employer of theft and threatened with arrest).

Defendants do not dispute the third prong of the intentional infliction of emotional distress test, causation, but do allege that Kalantar fails to satisfy the fourth element, requiring a showing that the emotional distress suffered was "severe." The court must agree with Lufthansa on this point. In *Russo v. White*, 400 S.E. 2d 160, 163 (Va. 1990), the court dismissed the plaintiff's claim of severe emotional distress when she simply "alleged that she was nervous, could not sleep, experienced 'stress and its physical symptoms . . . and was unable to concentrate at work." The court found that the plaintiff failed to allege "that she had any objective physical

injury caused by the stress, that she sought medical attention, that she was confined at home or in a hospital, or that she lost income." *Id*.

Unlike the plaintiff in *Russo*, Kalantar *has* alleged these things; the obstacle to pursuing this claim is that he has not introduced evidence sufficient to support them at trial.  Kalantar testified that around April 1, 2000, less than a week after the incident at Dulles, he "couldn't sleep for one or two nights" and arranged to see a psychiatrist, Dr. Arnold Wolfe, at his wife's insistence.  Kalantar Dep. at 139-40.  Aside from problems with sleeping, Kalantar also "started experiencing heart rapid [sic] and irregular heart rate . . . started having shaking of [his] eyelids," and difficulty with concentration.  *Id*. at 142.  Later, he experienced an outbreak of eczema on his hands, which he stated would recur when he was under stress.  *Id*.  Dr. Wolfe diagnosed Kalantar with "posttraumatic stress syndrome, severe," and "said the prognosis is good but it requires intensive treatment with both medication and psychotherapy."  *Id*. at 146.  To this end, Dr. Wolf prescribed Paxil, which Kalantar took between his initial visit and July 2000.  *Id*. at 147-48.  On the subject of lost wages, Kalantar testified that he delayed taking his Ph.D. exam due to the posttraumatic stress, although he admitted that this did not interfere with his plans to move to Los Angeles to assume a position as a professor of medicine.  *Id*. at 149-51.  He also alleged that if the incident of March 25, 2000 had not occurred, he "could have submitted more grant applications," and "could have received several million dollars of more funding for [his] research."  *Id*. at 153.

For several reasons, including a concern that "injury to the mind or emotions can be easily feigned," or at the very least difficult to assess objectively, courts have repeatedly emphasized that intentional infliction of emotional distress "is 'not favored' under the law of

Virginia," and have held plaintiffs seeking to recover under this cause of action to a heavier evidentiary burden. *Dixon v. Denny's, Inc.*, 957 F. Supp. 792, 796 (E.D. Va. 1996) (quoting *Ruth v. Fletcher*, 377 S.E. 2d 412, 415 (Va. 1989)); *accord Contreras v. Thor Norfolk Hotel, L.L.C.*, 292 F. Supp. 2d 798, 803 (E.D. Va. 2003).  Therefore, while Kalantar's deposition testimony alone is a sufficient evidentiary basis for him to reach a jury on several of his other common law tort claims, the absence of any "objectively verifiable evidence – such as medical bills or even the testimony of friends or family" to corroborate his allegations of severe emotional distress, *Dixon*, 957 F. Supp. at 796, compels the court to grant summary judgment for defendants on this claim.

### 5. Defamation

A cause of action for defamation recognizes that "the individual's right to personal security includes his uninterrupted entitlement to enjoyment of his reputation." *The Gazette, Inc. v. Harris*, 325 S.E. 2d 713, 720 (Va. 1985) (quoting *Fuller v. Edwards*, 22 S.E. 2d 26, 29 (Va. 1942)).  In Virginia, libel and slander are subspecies of defamation; libel refers to written defamation, while "spoken defamation, not reduced to writing, is slander." *Jordan v. Kollman*, 612 S.E. 2d 203, 206 (Va. 2005) (citing *MacPherson v. Green*, 87 S.E. 2d 785, 789 (Va. 1955)).  Virginia courts, however, "make[] no distinction between actions for libel and those for slander" in terms of applicable law. *Fleming v. Moore,* 275 S.E. 2d 632, 635 (Va. 1981) (citing *Shupe v. Rose's Stores*, 192 S.E. 2d 766, 767 (1972) (other citations omitted)).  In this case, Kalantar alleges that Starks and Vali-Coleman made defamatory statements about him "both verbally and in writing."  Am. Compl. ¶ 40.

The elements of defamation are (1) publication (2) of an actionable statement (3) with the requisite intent. *Jordan*, 612 S.E. 2d at 206 (citing generally *The Gazette*, 325 S.E. 2d 713). To constitute defamation, words "must refer to some ascertained or ascertainable person, and that person must be the plaintiff. If the words used really contain no reflection on any particular individual, no averment or innuendo can make them defamatory." *Ewell v. Boutwell*, 121 S.E. 912, 915, 916 (1924) (citation omitted). Furthermore, to be actionable the statement in question must be both false and "defamatory," *M. Rosenberg & Sons v. Craft*, 29 S.E. 2d 375, 378 (Va. 1944), that is, it "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citing RESTATEMENT (SECOND) OF TORTS § 559). "Merely offensive or unpleasant statements," in contrast, are not defamatory. *Id.* Likewise, "statements that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion," and are generally not actionable because they defy easy categorization as true or false. *Jordan*, 612 S.E. 2d at 206 (citing *Fuste v. Riverside Healthcare Ass'n*, 575 S.E. 2d 97, 101 (1985)). Whether a statement is an actionable statement of fact, or a non-actionable statement of opinion, is a question of law for the court. *Chaves v. Johnson*, 335 S.E. 2d 97, 101 (Va. 1985).

Kalantar here alleges that Vali-Coleman stated that "Iranian passports need to be searched because, according to FAA, Iranians are a security threat. According to FAA regulation Iranians are all [a] security threat. And I told her that I do not believe that [the] U.S. government has ever said something like that. Because the FAA regulation, which I read with my own eyes, did not have such a statement." Kalantar Dep. at 198-99. Vali-Coleman also allegedly said to Kalantar

27

that "[y]ou are an Iranian and all Iranians are a threat to the safety of the flight." *Id*. at 199.

Starks, meanwhile, allegedly told Kalantar that "you are a security threat and I cannot allow you

to fly." *Id*. at 201.  Contrary to defendants' assertion that "Plaintiff's own deposition makes no

specific mention of any defamatory comments," Defs.' Mot. for Summ. J. at 20, the court finds

that Kalantar has clearly identified specific, allegedly defamatory spoken statements – namely,

that he as an individual has been determined to pose a risk to the safety of the airplane and his

fellow passengers.[14]  Furthermore, these statements cannot be treated as mere expressions of

opinion; they imply, allegedly coming from an airline's paid professionals in an environment

highly attuned to safety and security, knowledge of facts that form a basis for the designation of

Kalantar as a "security threat."[15]  Because "[s]tatements clearly implying the existence of facts

are actionable as defamation," *Swengler v. ITT Corp. Electro-Optical Prods. Div.*, 993 F.2d

1063, 1071 (4th Cir. 1993) (citing *Ollman v. Evans*, 750 F.2d 970, 982 (D.C. Cir. 1984);

---

[14]     The court agrees with defendants that Kalantar has not identified any specific allegedly defamatory written statements, so he may not proceed with his defamation claim on this basis.

[15]     Kalantar has also testified that Vali-Coleman told him that "all Iranians with Iranian passport[s] require special treatment," Kalantar Dep. at 47, and that "since you have [an] Iranian passport you require [a] luggage search," *id*. at 26.  These alleged comments, while statements of fact rather than opinion, are not actionable because there is no indication how they are "defamatory," that is, how they would reflect adversely on Kalantar's reputation.
       Unlike these latter statements, which arguably bear a legitimate relationship to airline security procedures, Vali-Coleman and Starks' alleged characterization of Kalantar as a "security threat" cannot plausibly be construed as relating to "price, route, or service" of Lufthansa under the Airline Deregulation Act, 49 U.S.C. § 41713(b).  *See Fenn v. Am. Airlines*, 839 F. Supp. 1218, 1219, 1223 (S.D. Miss. 1993) (Airline Deregulation Act did not preempt defamation claim of airplane passenger accused of stealing a ring); *White v. America West Airlines, Inc.*, 786 N.E. 2d 497, 500 (Ohio Ct. App. 1993) (allegedly defamatory statements made by pilots and crew of airplane about passengers not preempted; court "unable to conceive of any situation where a defamatory statement is a 'service' of an airline.").

RESTATEMENT (SECOND) OF TORTS § 566, comment (b) (other citation omitted)), the court finds that Vali-Coleman and Starks' alleged statements are actionable as a matter of law.

As to whether the alleged statements were "published," Kalantar testified that during his encounter with Vali-Coleman, she spoke "so loud that many passengers heard," Kalantar Dep. at 49, and that "twenty to fifty other passengers" were within earshot, *id.* at 191.  A plaintiff's testimony that an allegedly defamatory statement was heard by others is "sufficient to take the question of publication to the jury." *Cohen v. Power*, 32 S.E. 2d 64, 65 (Va. 1944) (citations omitted); *see also Food Lion, Inc. v. Melton,* 458 S.E. 2d 580, 585 (Va. 1995) ("in order to establish prima facie evidence of publication, a plaintiff is not required to present testimony from a third party regarding what that person heard and understood, or to identify the person to whom the defamatory words were published.").

The third element of establishing a defamation claim is the intent of the speaker.  Where the plaintiff is not a public official or a public figure, he must prove by a preponderance of the evidence that the statement was false and that the defendants "either knew the statements were false or, believing them to be true, lacked reasonable grounds for such belief or acted negligently in failing to ascertain the truth." *Ingles v. Dively*, 435 S.E. 2d 641, 645 (Va. 1993) (citing *The Gazette,* 325 S.E. 2d at 724-25).  In other words, "a negligence standard applies." *Food Lion*, 458 S.E. 2d at 584.  Whether Kalantar "was actually defamed (including whether the statements were true or false), whether the defendant[s] acted with the requisite level of fault, and whether the plaintiff was damaged" are questions properly presented to the jury. *Wells v. Liddy*, 186 F.3d 505, 526 n.18 (4th Cir. 1991); *see also Chaffin v. Lynch*, 6 S.E. 474, 476 (Va. 1888) (question of intent, including whether defendant believed the statement to be true, properly before the jury).

Finally, whether an allegedly defamatory statement is actionable *per se* (by itself) or *per quod* (whereby) is a question of law for the court. *Yeagle v. Collegiate Times*, 497 S.E. 2d 136, 138 (Va. 1998) (citations omitted).  Under Virginia law, four types of statements are actionable on their face, or *per se*:

> (1) Those which impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished. (2) Those which impute that a person is infected with some contagious disease, where if the charge is true, it would exclude the party from society. (3) Those which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment. (4) Those which prejudice such person in his or her profession or trade.

*Fleming*, 275 S.E. 2d at 635 (citing *Shupe*, 192 S.E. 2d at 767 (internal citation omitted)).

When a defamatory statement is actionable *per se*, "compensatory damages for injury to reputation, humiliation, and embarrassment are presumed." *Tolman v. Doe*, 988 F. Supp. 582, 587 (E.D. Va. 1997) (citing *Great Coastal Express v. Ellington*, 334 S.E. 2d 846, 852 (Va. 1985)).  Vali-Coleman and Starks' alleged comments identifying Kalantar (and all other Iranians) as a security threat, however, do not accuse him of a specific, indictable criminal offense (such as hijacking), nor do they fall within any of the other three categories of *per se* defamation.  When an alleged defamation is not actionable *per se*, the plaintiff must prove "special harm," such as actual pecuniary loss, to obtain compensatory damages.  *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1558 n.15 (4th Cir. 1994); *see also Fleming*, 275 S.E. 2d at 638-39.  Going forward to trial on his defamation claim, Kalantar will bear this evidentiary burden.

### 6. Malicious Prosecution

A plaintiff asserting a claim of malicious prosecution must show that "the prosecution was (1) malicious; (2) instituted by, or with the cooperation of, the defendant; (3) without probable cause; and (4) terminated in a manner not unfavorable to the plaintiff." *Stanley v. Webber,* 531 S.E. 2d 311, 314 (Va. 2000).  Defendants do not deny that they participated in the "prosecution" of Kalantar, or that the proceedings terminated in his favor, but only that he was not prosecuted maliciously, because "[d]efendants were acting in accordance with FAA security directives."  Defs.' Mot. for Summ. J. at 20-21.

This tort requires that the defendant manifest "legal malice" as opposed to "actual malice." *Oxenham v. Johnson*, 402 S.E. 2d 1, 5 (Va. 1991) (citing *F.B.C. Stores, Inc. v. Duncan,* 198 S.E. 2d 595, 600 (1973)).[16]  A defendant exhibits legal malice when he "is actuated by improper and indirect motives," and need not be acting out of spite, hatred, "actual malevolence or corrupt design." *Forbes v. Hagman*, 75 Va. 168, 1881 WL 6260 at *10 (Va. 1881) (citations omitted).  Probable cause, another component of this cause of action, has been defined as "knowledge of such facts and circumstances to raise the belief in a reasonable mind, acting on those facts and circumstances, that the plaintiff is guilty of the crime of which he is suspected." *Lee v. Southland Corp.*, 244 S.E. 2d 756, 758-59 (Va. 1978) (quoting *Va. Ry. & Power Co. v. Klaff*, 96 S.E. 244, 246 (Va. 1918)).  When facts relating to the existence of probable cause are in dispute, "the issue is one of fact to be resolved by the trier of fact."  *Stanley*, 531 S.E. 2d at 315 (citing *Lee*, 244 S.E. 2d at 759).

---

[16]     To be awarded punitive damages, however, a plaintiff must show that the defendant acted with "actual malice." *Oxenham*, 402 S.E. 2d at 5 (citing *F.B.C. Stores*, 198 S.E. 2d at 600).

The first and third elements of this tort are closely related. Indeed, a lack of probable cause has been found sufficient to support a finding of legal malice. *Oxenham*, 402 S.E. 2d at 10 n.3 (citing *Giant of Va., Inc., v. Pigg*, 152 S.E. 2d 271, 276 (1967)); *Peacock Buick, Inc. v. Durkin,* 277 S.E. 2d 225, 227 n.2 (Va. 1981) ("in actions for malicious prosecution, false arrest, and false imprisonment . . . legal malice will be presumed from a showing of the lack of probable cause."); *Forbes*, 1881 WL 6260 at *10 ("malice may be, and generally is, inferred from want of probable cause . . . [i]t is always a question for the jury under all the circumstances of the case.").

Kalantar has introduced sufficient evidence that the defendants were animated by improper motives in seeking his arrest, and thus that defendants were malicious in their prosecution of him. First, by Kalantar's account, Vali-Coleman was exasperated with his questioning and perceived interference with their operations. Kalantar Dep. at 34, 49, 54. Then, Starks, apparently angered at Kalantar's criticism of his treatment, told Kalantar that "[w]e decided to deny you the flight because you refused luggage search and you called us racist." *Id*. at 80. Later, Starks smiled at Kalantar as he was being led away, *id*. at 86-87, and both Starks and Vali-Coleman allegedly sought Kalantar's arrest because he "disturbed" them, *id*. at 107. Two police officers, including one of the arresting officers, told Kalantar that they had no reason to arrest and detain him, but that Lufthansa employees insisted that they do so. *Id*. at 98, 101, 106-07. There is simply no ground upon which the court, as a matter of law, can conclude that Kalantar's claim of malicious prosecution should be dismissed.

### 7. Abuse of Legal Process

Abuse of process is the "malicious perversion of a regularly issued process" in pursuit of "a result not lawfully or properly attainable" under such process. *Glidewell v. Murray-Lacy*, 98 S.E. 665, 668 (Va. 1919) (citations omitted). To sustain this cause of action, a plaintiff must plead and prove two elements: "(1) the existence of an ulterior purpose; and (2) an act in the use of the process not proper in the regular prosecution of the proceedings." *Donohoe Constr. Co., Inc. v. Mt. Vernon Assocs.,* 369 S.E. 2d 857, 862 (Va. 1988) (citing *Mullins v. Sanders*, 54 S.E. 2d 116, 121 (1949); *Glidewell*, 98 S.E. 2d at 668).

Distinct from a claim of malicious prosecution, this cause of action "lies in the abuse or the perversion of the process *after* it has been issued." *Triangle Auto Auction, Inc. v. Cash,* 380 S.E. 2d 649, 651 (Va. 1989) (quoting *Donohoe*, 369 S.E. 2d at 862) (emphasis added)); *see also Tomai-Minogue v. State Farm Mut. Auto. Ins. Co.,* 770 F.2d 1228, 1237 (4th Cir. 1985) (while malicious prosecution involves "institution of process for its ostensible result but without probable cause, abuse of process is the improper use of otherwise regularly issued process in a manner not contemplated by law after its issuance."). Even if the arrest or other proceeding initiating the "process" was "justifiable and proper in its inception," a plaintiff may properly maintain an action "founded on grievances arising in consequence of subsequent proceedings." *Glidewell*, 98 S.E. 2d at 668.

In this case, while Kalantar has alleged that defendants "maliciously caused process to issue," *id*. at 667-68, supporting his malicious prosecution claim, he has not alleged any "process" that defendants used against him after they summoned police and made their initial

complaint.  *See Ely v. Whitlock*, 385 S.E. 2d 893, 897 (Va. 1989) (no abuse of process where

lawyer simply filed ethics complaint against another attorney); *Triangle*, 380 S.E. 2d at 651 (no

abuse of process where used car wholesaler "swore out" warrants against car dealer for grand

larceny more than one month after the dealer passed bad checks).  Rather, Kalantar appeared in

front of a judge, who set a trial date approximately one or two months after the detention.

Kalantar Dep. at 132.  Kalantar's counsel stated that "[a]fter the arraignment, at the trial date,

there was a plea of not guilty," and ultimately, "the matter was dropped."  *Id*. at 133-34.  Kalantar

testified that he "did not know" if anyone from Lufthansa appeared to testify in court against him,

*id*. at 134, and that he "did not see anybody" from Lufthansa at his trial appearance because he

"did not look around" the courthouse, *id*. at 145.  Because Kalantar has not alleged any facts, let

alone introduced any evidence, sufficient to support an abuse of process claim, the court grants

summary judgment for defendants on this count.

### 8. Civil Conspiracy

A civil conspiracy is an agreement "of two or more persons, by some concerted action, to

accomplish some criminal or unlawful purpose," or to accomplish a lawful purpose "by criminal

or unlawful means."  *Hechler Chevrolet, Inc. v. Gen. Motors Corp.*, 337 S.E. 2d 744, 748 (Va.

1985) (citing *Werth v. Fire Cos. Adjustment Bureau*, 171 S.E. 255, 258-59 (Va. 1933)).

Contrary to defendants' claim that "there was a [] unilateral act by [d]efendants, not a

conspiracy," Defs.' Mot. for Summ. J. at 22, Kalantar alleges that *two* individuals, Vali-Coleman

and Starks, worked in concert when they urged airport police to arrest and detain him, Kalantar

Dep. at 228.  The fact that Vali-Coleman and Starks worked for the same employer, on the same

34

job site, does not somehow fuse them together for purposes of conspiracy liability.  Although

Starks disputes "giv[ing] reports of this incident to anybody," he admitted to being "involved in

the drafting" of the report.  Starks Dep. at 32.  He further stated that Vali-Coleman also worked

on the report, but that he could not remember if any other Lufthansa employees did as well.  *Id.*

at 41.  He denied having any communications with the police after Kalantar's arrest.  *Id.* at 75.

Vali-Coleman, meanwhile, stated that she handed the incident report to the police, Vali-Coleman

Dep. at 23, and admitted to having a conversation with Sergeant Pellerin, who was on duty where

Kalantar was detained, although she did not remember insisting that charges be pressed against

Kalantar, *id.* at 80-82.  Most crucially for the present posture of this case, Kalantar disputes this

assertions.  Therefore, whether the two individual defendants acted together to accomplish an

unlawful purpose as Kalantar contends, such as by arranging his arrest or detention, is a question

of fact for the jury.

### 9. Conceded Claims

Defendants correctly note that the tort of loss of consortium is not recognized under

Virginia law, *see Floyd v. Miller*, 57 S.E. 2d 114, 117 (Va. 1950), a point Kalantar does not

dispute.  Pl.'s Opp'n at 26 n.6.  Defendants also point out that Kalantar's claims under "Virginia

Human Rights Laws" must fail because to proceed with such claims a plaintiff must first exhaust

an administrative process which Kalantar had evidently never initiated.  Because Kalantar offers

no response to defendants' arguments on his state human rights law claims, the court treats the

issue as conceded and grants summary judgment for defendants.

**III. CONCLUSION**

For the foregoing reasons, the court concludes that defendants' motion for summary judgment must be granted in part and denied in part.

**ORDER**

Accordingly, it is this 16th day of September, 2005, hereby

**ORDERED**, that defendants' motion for summary judgment is **GRANTED** with respect to Kalantar's claims arising under the Federal Aviation Act, § 1981 of the Civil Rights Act of 1866, Title II of the Civil Rights Act of 1964, and the Warsaw Convention, as well as his common law tort claims for assault and battery, intentional infliction of emotional distress, abuse of process, loss of consortium, and violation of "Virginia human rights laws"; and **DENIED** with respect to Kalantar's claims for the common law torts of false arrest, defamation, malicious prosecution and civil conspiracy.

> Henry H. Kennedy, Jr.
> United States District Judge